1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CRISTIAN NAVARRETE,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY OF KENT, a municipal corporation, and JAMES SHERWOOD, and his marital community,<br><br>          Defendants. | CASE NO. 2:22-cv-01431<br><br>ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## 1.  INTRODUCTION

Plaintiff Cristian Navarrete sues the City of Kent and Officer James Sherwood of the Kent Police Department under 42 U.S.C. § 1983, alleging judicial deception and fabrication of evidence. Navarrete also pursues a *Monell* claim against the City and state-law claims against Officer Sherwood. Defendants have moved for summary judgment on each of these claims. Dkt. No. 83. Having considered the Parties' briefing, the record, and the relevant law, the Court finds that issues of material fact preclude summary judgment on Navarrete's claims

against Officer Sherwood, but that Navarrete has failed to establish a triable issue about municipal liability against the City of Kent.

Accordingly, the Court GRANTS IN PART Defendants' motion. Dkt. No. 83.

## 2.  BACKGROUND

On July 14, 2020, two teenagers shot another teenager north of the Kent Transit Center, causing serious injuries. The Kent Police Department responded, and Defendant Officer James Sherwood led the investigation into the shooting. Detective John Crane participated in the investigation. The central dispute in this case is whether Officer Sherwood deliberately omitted and misrepresented material facts in warrant applications that led to Navarrete's arrest and prosecution for a crime he did not commit.

### 2.1   Kent police officers investigated a shooting involving two suspects of different heights.

Through witness interviews, the officers learned that the victim, his girlfriend, and two of their friends had ridden the bus to the Kent Transit Center just before the shooting. While on the bus, they met and spoke with the suspects, two Hispanic male teenagers identifying as Sureños. Dkt. No. 109-1 at 86–88. When the bus arrived at the transit center, the victim and his girlfriend separated from their friends. *Id*. at 88. The suspects apparently followed them and later approached them from behind, asked for directions, then shot the victim. *Id*. at 86, 96–98.

The officers obtained surveillance footage from two sources that would become central to the identification dispute: a local business showing the two

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

suspects walking through an alley before the shooting, and footage from Metro Transit showing the eyewitnesses and suspects together on the bus. *Id.* at 87, 142–43. Because the suspects appeared young, Detective Crane sent still images to Renton High School's resource officer, who was "90% sure" that the taller suspect was Luis Cano but did not recognize the shorter suspect. *Id.* at 89, 196.

The officers later obtained a search warrant for Cano's family home, and SWAT served the warrant on September 8, 2020, leading to Cano's arrest. *Id.* at 90.

There is no dispute that Cano stands 5'10" tall and was one of the perpetrators. Dkt. No. 115-1 at 18.

**2.2    Surveillance footage and witnesses established height differences between suspects.**

The surveillance footage and witness statements established that one suspect was noticeably taller than the other, creating a height differential central to the Court's probable cause analysis below.

Detective Crane noted in his case report that "[o]ne suspect, listed here as Suspect 1, is taller," while "[t]he other suspect, listed here out [sic] as Suspect 2, is shorter." Dkt. No. 109-1 at 106. A subsequent interview with one of the victim's friends confirmed that one of the suspects "was taller and one was shorter[.]" *Id.* at 140.

These are the still images from the surveillance footage:







Dkt. No. 84 at ¶ 11.

Navarrete maintains that the surveillance footage shows that one of the individuals is taller and has lighter skin than the other. Officer Sherwood testified that the footage does not show an appreciable difference in skin tone. Dkt. No. 84 at 16.

During a follow-up interview, an eyewitness stated that "[o]ne [suspect] was short and one was tall." Dkt. No. 109-1 at 157–58. She estimated that the shorter suspect was about her height or slightly taller, so about 5'4", *id.*, while describing the taller suspect as between 5'10 and 6'. Dkt. No. 84 at 4, 15. Officer Sherwood confirmed that this eyewitness believed the shorter suspect was "approximately"

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

"half a foot" shorter than the taller suspect. Dkt. No. 109-1 at 22. The same witness also noted a difference in skin tone, stating that the shorter suspect had darker skin than the taller suspect. Dkt. No. 109-1 at 164.

## 2.3    V.C.—a minor—provided the only identification of Navarrete through two separate interviews.

The identification of Navarrete as the shorter suspect rests entirely on statements by V.C., Cano's fourteen-year-old sister. The Parties present different characterizations of the circumstances and reliability of her identification.

### 2.3.1    Officers interviewed V.C. during the SWAT search of her family home.

While the SWAT team searched Cano's family home at 5:30 a.m., Officer Sherwood interviewed Cano's parents and V.C. separately, showing them surveillance images for identification purposes. Dkt. No. 109-1 at 90, 217–23. Cano's mother and V.C. identified Cano as the taller suspect; but Cano's parents didn't recognize the shorter suspect at all. *Id*. at 90; Dkt. No. 109-1 at 90, 211.

When Officer Sherwood asked V.C. about the shorter suspect, she repeatedly stated, "I can't be sure it's him," indicating that Officer Sherwood had been discussing a specific person with her before beginning the recorded interview. *Id*. at 218. When Officer Sherwood directed her attention to "the shorter person" in the photos, V.C. said, "I don't recognize him." *Id*. She eventually referenced the bus photo and said, "[w]ell, this looks like Christian, that, the person I'm talking about,

1    but . . . I can't say cause it's like blurry."[1] *Id.* at 223. V.C. also stated that she did

2    not believe the surveillance footage from the bus showed the same person as the

3    surveillance footage from the alley. *Id.* at 222. Finally, V.C. told the officers that

4    "Christian" lived in the same mobile home park as her family and that her brother,

5    Cano, hung out with him infrequently. *Id.* at 219, 222.

6        ### 2.3.2    Officers conducted a second interview with V.C. alone at
              Goodwill.

7

8        On September 29, 2020, Officer Sherwood and Detective Crane interviewed

9    V.C. again. *See* Dkt. No. 109-1 at 52–53. When they went to her family home, a

10   neighbor told them that she was at Goodwill. Dkt. No. 84 at 11. Officer Sherwood

11   then called V.C. directly on her personal cell phone, told her that he knew she was

12   at Goodwill, and asked if he could interview her again. Dkt. No. 109-1 at 53–55. The

13   officers did not ask V.C. whether she wanted her parents present, nor did they

14   inform her parents of the interview. Dkt. No. 115-1 at 16 (filed under seal); *see* Dkt.

15   No. 84 at 11–12. Officer Sherwood and Detective Crane met V.C. at Goodwill and

16   interviewed her in the parking lot, alone. *Id.*

17       The officers questioned V.C. with the same surveillance photos again, and

18   V.C. again expressed confusion about whether the surveillance footage from the

19   alley showed the same person as the surveillance footage from the bus. Dkt. No. 84-

20   7 at 13. As Officer Sherwood explains, "I showed V.C. the same photos again and

21

22   [1] Plaintiff's name is correctly spelled "Cristian Navarrete." Throughout Officer
     Sherwood's affidavit, police reports, and other investigative documents, his first
23   name was frequently misspelled as "Christian." This order uses the correct spelling
     except when directly quoting source materials that contain the misspelling.

1    she asked if the male walking next to her brother was the same guy sitting down in

2    the bus. I told her they were." *Id.* In addition to these photos, the officers showed

3    her Navarrete's school photo.  Dkt. No. 109-1 at 52–56; *see also* Dkt. No. 84-5; 109-1

4    at 188.

5        After this, Officer Sherwood recorded approximately two minutes of the

6    interview:

7        DET. SHERWOOD: Okay. [V.C.], I showed you pictures again
         because I just wanted to clarify a few things. In those pictures I
8        showed you, there was two people, one in a blue shirt, which you
         said was your brother, correct?

9        MISS C: Yeah. Yes.

10       DET. SHERWOOD: And then there was another male that was on
11       the bus with your brother and also walking with him. That person
         you -- you said that you did -- that he looks like who?

12       MISS C: Cristian.

13       DET. SHERWOOD: Okay. And is he the fourth one in from the
14       entrance, on the east side? Okay. Now, Cristian. You said that you
         recognize him as Cristian. How certain are you?

15       MISS C: Well, I'm for sure for sure that's him.

16       DET. SHERWOOD: Okay. Are you -- like say zero percent to a
17       hundred percent?

18       MISS C: A hundred.

19       DET. SHERWOOD: A hundred percent that that's Cristian?

20       MISS C: Yes.

21       DET. SHERWOOD: Okay. All right. Do you know if he is associated
         with any gangs?

22       MISS C: No. I'm not – no.

23

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 7

1

2

DET. SHERWOOD: Okay. But your brother Luis hangs out with him?

MISS C: Yes.

DET. SHERWOOD: Okay. All right. And is there anything else that you could think of about those photos that sticks out to you that you know that that is Cristian?

MISS C: No.

DET. SHERWOOD: All right. Just seeing his face?

MISS C: Yeah.

DET. SHERWOOD: Okay. All right. Is there anything else that you'd like to add to this statement at this time?

MISS C: No.

Dkt. No. 84-5 at 1–4.

**2.4    Cano identified a different person as his accomplice.**

Later, Officer Sherwood interrogated Cano, but Cano did not identify Navarrete. Instead, he identified the shorter suspect as "Wiked" and denied knowing his real name. Dkt. No. 84 at 10–11. After Cano's arrest, Detective Crane asked the student resource officer at Renton High School if he knew anybody associated with Cano named "Christian." Dkt. No. 109-1 at 48–49, 135. The resource officer responded that if it was "related to Luis Cano, it's Christian Navarrete," and provided Navarrete's school photo. *Id*. at 135. Notably, this was the same school resource officer who had previously identified Cano—and not the shorter suspect—from the surveillance footage.

Officer Sherwood then "ran" Navarrete's full name and obtained additional information about Navarrete's physical characteristics that became material to the probable cause analysis. When he accessed Navarrete's learner's permit, he found his height listed as 5'9"—making him only one inch shorter than Cano (5'10") rather than the "half a foot" differential observed by witnesses. *Id*. at 49–50.

### 2.5    Officer Sherwood submitted warrant applications containing selective information and omissions.

Officer Sherwood submitted a probable cause affidavit in support of his application for a search warrant of Navarrete's home ("Affidavit") and later filed a certification for determination of probable cause supporting Navarrete's prosecution.

Using the surveillance images, the Affidavit refers to one suspect as "taller" and the other as "shorter." *Id*. at 3–4. Officer Sherwood states that the shorter male was "identified" as Navarrete, and the taller male was identified as Cano. *Id*. He writes that one witness believed the "shorter" suspect was 5'5" to 5'6," and the taller suspect as 5'10" to 6'. He recounts the witness's statement that the taller suspect "was light skinned compared to the other guy." *Id*. at 7.

The Affidavit relies on V.C.'s identification to support the assertion that the shorter suspect was "later identified" as Navarrete. *See id*. at 4. Officer Sherwood summarizes his first interview with V.C. by stating that "[V.C.] told me the other guy in the dark clothing looked like Christian and advised he lives in the same mobile home park as them, the 4th trailer from the entrance. [V.C.] told me that Luis and Christian do hang out but not all the time." *Id*. at 11.

Officer Sherwood describes his second interview with V.C. as follows:

> I showed V.C. the same photos again and she asked if the male walking next to her brother was the same guy sitting down in the bus. I told her they were. V.C. pointed to the male sitting down in the bus wearing the black clothing without his mask on and told me that was definitely Cristian. Detective Crane had obtained a school photo of Cristian from School Resource Officer Kerkhoff. I showed that photo to V.C. who told me "yeah that is Cristian."

*Id.*

Officer Sherwood also states that he "ran Christian's name" and found his full name and address. Dkt. No. 84-6 at 11.

Officer Sherwood's affidavit omits information about Navarrete's height and skin tone, despite Officer Sherwood having access to Navarrete's learner's permit information. The Affidavit does not mention that V.C. is a minor or describe the circumstances of either interview. It does not include V.C.'s expressions of uncertainty during the first interview, her statement that the images were "blurry," or her doubt about whether different surveillance footage showed the same person. The Affidavit does not mention that V.C.'s parents failed to recognize the shorter suspect or that the first interview occurred during a SWAT search of V.C.'s family home.

## 2.6   The search of Navarrete's home yielded no physical evidence.

Officer Sherwood and other KPD officers executed the search warrant on Navarrete's family home on October 7, 2020, and arrested him. Dkt. No. 84-9 at 8. Detectives searched the home but found no gun or identifying clothing. Officer Sherwood's testimony confirms that officers "did not obtain any items of evidentiary

value for the case during th[e] exhaustive search [of Navarrete's home]." Dkt. No. 109-1 at 62.

Later that day, Officer Sherwood filed a certification for determination of probable cause, stating there was probable cause to believe that Navarrete committed first degree assault and unlawful possession of a firearm. Dkt. No. 84 at 10. The certification largely mirrors the prior affidavit, with a few additions including Officer Sherwood's statement that during the search, "Christian [Navarrete] told [the officers] that the gun was never inside his residence." Dkt. No. 84-9 at 8. Officer Sherwood states that "Christian wouldn't say what happened to the gun but only stated it was never inside his residence" and "did elude [sic] that possibly someone else has it but wouldn't say who." *Id*. Navarrete denies making any statements that would have "elude[d]" to the gun used in the crime. Officer Sherwood did not record these statements.

## 2.7    Officer Sherwood handled evidence and disclosed information about an alternate suspect.

After arresting Navarrete, Officer Sherwood took photos of him standing in the interrogation room, in front of a wall plaque. He had taken photos of Cano in the same position after his arrest. While Officer Sherwood saved the photos of Cano by uploading them to "Evidence.com," he deleted the photos of Navarrete without uploading them. Dkt. No. 84 at 17. Navarrete claims that the destroyed photos were exonerating, as they would have shown that he was at least as tall as Cano. Dkt. Nos. 13 at 22; 109-1 at 231. Navarrete maintains that Officer Sherwood purposefully destroyed the photos, Dkt. No. 13 at 15, while Officer Sherwood asserts

that the photos were never disclosed as a result of "either [his] oversight or a technical error," and he states, "he had no intention of deliberately withholding the photographs." Dkt. No. 84 at 17.

In January 2021, Navarrete's attorney sent KPD materials implicating another suspect as the shooter. Officer Sherwood interviewed the new suspect on January 26, 2021. Dkt. No. 115-1 at 64 (filed under seal). It is now undisputed that this suspect is "Wiked," the person Cano had identified during his interrogation. Officer Sherwood took several photographs of this suspect during the interview, but did not include height comparison photos. *Id*. at 41–46 (photographs filed under seal). Officer Sherwood did not submit his supplemental police report detailing this interaction until May 3, 2021. Dkt. No. 109 at 12 (citing 115-1 at 64 (filed under seal)).

About a month later, the prosecutor emailed her staff stating, "[w]e have the wrong guy (just for Navarrete). We are dismissing tomorrow." Dkt. No. 115-1 at 47 (filed under seal). Navarrete spent 141 days in custody during the height of the COVID-19 pandemic, including Thanksgiving, Christmas, New Year's, and his birthday. Dkt. No. 112 ¶ 5.

## 3.  DISCUSSION

### 3.1  Legal standards.

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if it "might

1  affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

2  *Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the

3  court must view all facts in the light most favorable to the non-moving party and

4  draw all reasonable inferences in the non-moving party's favor. *Hawai'i Disability*

5  *Rts. Ctr. v. Kishimoto*, 122 F.4th 353, 363 (9th Cir. 2024).

6      Navarrete brings constitutional claims under 42 U.S.C. § 1983, which

7  "provides a cause of action for the 'deprivation of any rights, privileges, or

8  immunities secured by the Constitution and laws' of the United States." *Long v.*

9  *Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (quoting 42 U.S.C. § 1983). The

10  cause of action has two essential elements: "(1) that a right secured by the

11  Constitution or laws of the United States was violated, and (2) that the alleged

12  violation was committed by a person acting under the color of State law." *Id.* (citing

13  *West v. Atkins*, 487 U.S. 42, 48, (1988)). Here, the Parties do not dispute the second

14  element—that Defendants were acting under color of State law. As analyzed below,

15  Navarrete asserts that Defendants violated his Fourth Amendment right to be free

16  of unreasonable search and seizure and his Fourteenth Amendment right to Due

17  Process.

18  **3.2    Defendants are not entitled to summary judgment on Navarrete's**
19      **Fourth Amendment judicial deception claim.**

20      Navarrete asserts a cause of action under Section 1983 for violations of his

21  Fourth Amendment rights, claiming Officer Sherwood obtained his arrest warrant

22  through judicial deception. "Just as the Fourth Amendment prohibits warrantless

23  searches [and seizures] generally, so too does it prohibit a search [or seizure]

1  conducted pursuant to an ill-begotten or otherwise invalid warrant." *Bravo v. City of*
2  *Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011). "'Judicial deception' consists of
3  either 'deliberate omission or affirmative misrepresentation.'" *Scanlon v. Cnty. of*
4  *Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024) (quoting *David v. Kaulukukui*, 38
5  F.4th 792, 801 n.3 (9th Cir. 2022)). Indeed, "[w]hether the alleged judicial deception
6  was brought about by material false statements or material omissions is of no
7  consequence." *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997). An
8  affiant violates an individual's Fourth Amendment rights by "intentionally or
9  recklessly omit[ting] facts required to prevent technically true statements in the
10 affidavit from being misleading." *Id.* (quoting *United States v. Stanert*, 762 F.2d
11 775, *as amended*, 769 F.2d 1410 (1985)). In other words, officers cannot manipulate
12 probable cause by "reporting less than the total story[.]" *Id.* (quoting *United States*
13 *v. Stanert,* 762 F.2d 775, 781, as amended, 769 F.2d 1410 (1985)).

14        "To survive summary judgment on a claim of judicial deception, a § 1983
15 plaintiff need not establish specific intent to deceive the [warrant] issuing court."
16 *Bravo*, 665 F.3d at 1083 (citing *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124
17 (9th Cir. 1997)). "Rather, the plaintiff must (1) establish that the warrant affidavit
18 contained misrepresentations or omissions material to the finding of probable
19 cause, and (2) make a 'substantial showing' that the misrepresentations or
20 omissions were made intentionally or with reckless disregard for the truth." *Id.*
21 (citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1223–24 (9th Cir. 2009)); *Liston*,
22 120 F.3d at 973–74. "Clear proof of deliberation or recklessness is not required at
23 the summary judgment stage*.*" *Scanlon*, 92 F.4th at 800 (citation modified). "If a

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 14

1    plaintiff satisfies these requirements, the matter should go to trial." *Id.* (citation

2    modified).

3        The Court addresses each element below.

### 3.2.1    Officer Sherwood's warrant affidavit contained misrepresentations and omissions material to probable cause.

6        Whether the contested misrepresentations and omissions are material to

7    probable cause is a question of law for the court to decide. *Bravo*, 665 F.3d at 1084

8    (citing *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) ("Materiality is for the

9    court, state of mind is for the jury.")). The court determines the materiality of the

10   false statements or omissions by assessing "whether the [officer's] affidavit, once

11   corrected and supplemented, establishes probable cause." *Bravo*, 665 F.3d at 1084

12   (quoting *Ewing*, 588 F.3d at 1224)); *Liston*, 120 F.3d at 973 (quoting *Stanert*, 762

13   F.2d at 782) (The district court considers whether the corrected affidavit would have

14   provided "[the issuing] magistrate with a substantial basis for concluding that

15   probable cause [for a warrant] existed").

16       "The Supreme Court has declined to articulate a 'neat set of legal rules' for

17   evaluating probable cause, and instead has instructed magistrate judges to

18   determine probable cause by considering the 'totality-of-the-circumstances.'" *Chism*

19   *v. Washington*, 661 F.3d 380, 389 (9th Cir. 2011) (citation modified). Probable cause

20   for an arrest exists when "officers have knowledge or reasonably trustworthy

21   information sufficient to lead a person of reasonable caution to believe that an

22   offense has been or is being committed by the person being arrested." *United States*

23

1  *v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). If the district court concludes that

2  probable cause remains after amendment, "then no constitutional error has

3  occurred." *Bravo*, 665 F.3d at 1084.

4      Here, the Court must determine whether, after correcting Officer Sherwood's

5  statements about V.C.'s identification and including the omitted information about

6  Navarrete's appearance and height, probable cause existed to arrest him as the

7  "shorter" suspect.

8          a.    <u>Officer Sherwood's probable cause statement and certification of</u>
               <u>probable cause omit material information about Navarrete's physical</u>
9              <u>characteristics.</u>

10     In the Ninth Circuit, discrepancies in physical characteristics—particularly

11 height and other identifying features—can significantly impact probable cause

12 determinations when the differences are substantial. *See Garcia v. Cnty. of*

13 *Riverside*, 817 F.3d 635, 640–42 (9th Cir. 2016) (collecting cases on height and

14 weight discrepancies affecting probable cause). For example, in *Garcia,* the Ninth

15 Circuit emphasized that a nine-inch height difference between the warrant subject

16 and the detained individual was a "red flag" that could not be ignored and

17 warranted additional identity checks. *Id.* at 642. Similarly, in *Grant v. City of Long*

18 *Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002), the Ninth Circuit held that mere

19 resemblance to a general description is insufficient to establish probable cause

20 when descriptions are vague or conflicting—finding that a 5'7" Hispanic male could

21 not reasonably be mistaken for a 6'2" Caucasian male based on the descriptions

22 provided. *See also United States v. Ricardo*, 912 F.2d 337, 342 (9th Cir. 1990)

23

1    (officers did not have probable cause to arrest a suspect because he fit the

2    descriptions of a "thin man, not too tall" and "young Mexican male").

3    Officer Sherwood's investigation emphasized the suspects' relative heights,

4    consistently referring to one suspect as the "taller" one and the other as the

5    "shorter" one throughout his affidavit. Dkt. No. 84-6 at 3–7. While skin tone was not

6    the organizing principle of the investigation like height was, it was another

7    distinguishing physical characteristic that witnesses noted and that Sherwood

8    included in his affidavit. *Id.* at 7. Yet Officer Sherwood's affidavit omitted crucial

9    information about both characteristics and whether Navarrete fit the description of

10   the second suspect.

11   Before seeking the warrant, Officer Sherwood ran Navarrete's name and

12   obtained his DMV records showing he stood 5'9". Dkt. No. 109-1 at 49-50. He knew

13   Cano, the "taller" suspect, was 5'10'. Yet his affidavit included witness estimates

14   placing the shorter suspect at 5'5" to 5'6" while omitting Navarrete's documented

15   height entirely. As *Chism* makes clear, officers cannot "pick and choose" facts to

16   manufacture probable cause where none exists. 661 F.3d at 386. Officer Sherwood's

17   selective inclusion of witness estimates while concealing documentary evidence

18   about Navarrete's height violates this principle.

19   Officer Sherwood's affidavit noted that a witness described the taller suspect

20   as "light skinned compared to the other guy," Dkt. No. 84-6 at 7, meaning that the

21   shorter suspect had darker skin. But Officer Sherwood's affidavit omitted any

22   information about Navarrete's actual skin tone, who like Cano, was lighter-skinned.

23   This omission is particularly significant given Officer Sherwood's statement that he

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 17

1    "did not perceive a meaningful difference in the suspects' complexions" on the

2    surveillance footage.[2] Dkt. No. 84 ¶ 51. If Officer Sherwood could not discern a skin

3    tone difference in the footage, this suggests either: (1) the witness's first-hand

4    observations were incorrect; or (2) the footage quality was insufficient to make such

5    determinations. Either interpretation should have prompted additional

6    investigation. By including the witness's observation about skin tone differences

7    while omitting both his own inability to confirm those differences and Navarrete's

8    actual complexion, Officer Sherwood selectively presented evidence to support

9    probable cause while withholding evidence that contradicted it. The surveillance

10   footage confirms the materiality of these omissions.

11        Even accepting Officer Sherwood's testimony that he could not determine

12   exact measurements from this footage, he could see—as this Court can see—

13   substantial differences between the suspects in both height and appearance. These

14   visible differences, combined with witness observations and Officer Sherwood's

15   knowledge of Navarrete's actual characteristics, would have alerted any reasonable

16   magistrate that Navarrete could not be the shorter, darker-skinned suspect.

17        Defendants argue that "courts generally consider height differences of five

18   inches or less to be insufficient to undermine probable cause," citing *Willis v. City of*

19

20   [2] Notably, Detective Crane, who assisted in the investigation, testified that he could
     see a difference in skin complexion between the suspects when viewing the
21   surveillance footage. When shown a still image from the surveillance footage during
     his deposition, Detective Crane testified that "the subject on right appears to have a
22   slightly darker complexion than the subject on the left." Dkt. No. 109-1 at 128–129.
     This contradicts Officer Sherwood's claim that he observed no appreciable difference
     in skin tone and corroborates witness observations that the shorter suspect had
23   darker skin than the taller suspect.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 18

1

2

*Bakersfield*, Case No. 1:21-cv-01077-CDB, 2024 WL 1624113, at *10 (E.D. Cal. April

3

15, 2024) and *Hayes v. Kern Cnty.*, Case No. 1:19-cv-01722-CDB, 2023 WL 8806570,

4

at *7 (E.D. Cal. Dec. 20, 2023). Dkt. No. 83 at 18. But these cases are inapposite—

5

both involved officers making good-faith arrests based on height estimates that

6

later proved inaccurate. They do not address the situation here, where evidence

7

showed that the suspect was *actually shorter* than the arrestee before the officers

8

even drafted a warrant application. Moreover, neither of these addressed the

9

cumulative effect of multiple physical characteristics excluding an arrestee from

10

being the perpetrator. In any event the cases are not binding on this Court, and

both are on appeal.

11

Including Navarrete's actual physical characteristics in the affidavit would

12

have revealed: (1) he stood 5'9", virtually identical to the "taller" suspect Cano at

13

5'10", not the 5'4" to 5'6" "shorter suspect"; and (2) he had lighter skin like Cano, not

14

the darker complexion witnesses attributed to the shorter suspect. No reasonable

15

magistrate would find probable cause to arrest someone who matched neither the

16

height nor the skin tone of the described perpetrator. These omissions were not

17

merely material—they were outcome-determinative.

18

        b.     <u>*Officer Sherwood's affidavit includes material mischaracterizations and omissions related to V.C.'s identification of Navarrete.*</u>

19

20

The reliability of witness identifications is critical to probable cause,

21

particularly when an identification provides the sole link between a defendant and

a crime. *Grant*, 315 F.3d at 1087–88. Courts must consider whether identification

22

procedures were impermissibly suggestive and whether the witness exhibited

23

1    sufficient indicia of reliability. *Id*. Here, V.C.'s identification of Navarrete was the

2    only evidence connecting him to the shooting, yet Officer Sherwood's affidavit

3    omitted critical information undermining its reliability.

4        Officer Sherwood's affidavit states that V.C. was "100% positive" about her

5    identification while failing to disclose the highly suggestive circumstances that

6    produced it. Officer Sherwood never stated that V.C. was a child or that she was

7    alone during both interviews. He did not inform the issuing court that V.C.—at

8    fourteen years old—was present during the 5:30 a.m. SWAT search of her family

9    home, which immediately led to her brother Cano's arrest. Officer Sherwood also

10   omitted the fact that the first interview took place at V.C.'s family home during that

11   SWAT search.

12       Similarly, Officer Sherwood omitted key information about his second

13   interview with V.C. First, Officer Sherwood failed to explain how he initiated the

14   second interview—by calling V.C.'s cell phone directly, telling her he knew she was

15   at Goodwill, and asking to meet her there in the parking lot to speak with her

16   again. He did not mention that V.C. was alone when she agreed to meet him and

17   Detective Crane at Goodwill for further questioning. During the recorded portion of

18   this second interview—lasting only two minutes—Officer Sherwood spoke 291

19   words while V.C. spoke only 29, a ten-to-one ratio demonstrating his domination of

20   the conversation. Dkt. No. 110 at 7.

21       The affidavit's assertion that V.C. "told me the other guy in the dark clothing

22   looked like Christian" materially mischaracterizes her interviews. The recording

23

1    transcripts reveal that V.C. repeatedly expressed inability and unwillingness to

2    identify the shorter suspect:

3    • When asked about "the shorter person," V.C. said, "I don't recognize him."

4       Dkt. No. 84-2 at 2.

5    • She later stated: "I'm not sure if it's Christian." Dkt. No. 109-1 at 218.

6    • Most tellingly, she explained: "I can't say cause it's like blurry." Dkt. No.

7       109-1 at 223.

8    Officer Sherwood included the partial statement that the suspect "looked like

9    Christian" while omitting V.C.'s immediate qualifier that she "can't say" because of

10   image quality. This selective quotation manipulated the inference the magistrate

11   would draw about the reliability of V.C.'s identification. *See Liston*, 120 F.3d at 973

12   (by "reporting less than the total story, an affiant can manipulate the inferences a

13   magistrate will draw").

14        Most critically, the evidence indicates Officer Sherwood showed V.C.

15   Navarrete's school photograph before obtaining her "100%" identification. Showing

16   a witness a single photograph of the police's chosen suspect is "danger[ous]" because

17   it signals whom the police believe committed the crime. *Simmons v. United States*,

18   390 U.S. 377, 383 (1968)*; see Grant*, 315 F.3d at 1087–88 (explaining that Supreme

19   Court has warned against emphasizing one person's photograph during

20   identification procedures). Here, Officer Sherwood showed V.C. the same blurry

21   images she couldn't identify three weeks earlier, but now supplemented them with

22   a clear school photograph of Navarrete—essentially directing this isolated fourteen-

23   year-old toward the identification he sought.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 21

1
2
3
4
5
6
7
8
9

The affidavit also omitted that no adult who viewed the surveillance images identified Navarrete, despite several having the capacity to do so. V.C.'s parents, who knew Navarrete from their neighborhood, failed to recognize him as the shorter suspect. Dkt. No. 109-1 at 90, 211. The School Resource Officer, who knew both Navarrete and Cano as students, identified Cano with "90% certainty" but did not recognize the "other guy" as Navarrete. *Id.* at 89, 196. This omission is material because it shows that adults with greater familiarity and maturity could not make the identification that Officer Sherwood claimed a fourteen-year-old made with absolute certainty.

10
11
12
13
14
15
16
17

Upon correcting and supplementing Officer Sherwood's affidavit, *see Bravo*, 665 F.3d at 1084, the Court finds that the only evidence linking Navarrete to the crime was an identification obtained through suggestive procedures from a fourteen-year-old who: (1) repeatedly stated she couldn't identify the suspect from the surveillance images; (2) only expressed certainty after being shown Navarrete's school photograph; (3) was interviewed alone without her parents; and (4) whose identification was not corroborated by any adult who viewed the same evidence, including her own parents who knew Navarrete.

18
19
20
21
22
23

These omissions and misleading statements are material, as the corrected affidavit would *not* have provided "[the issuing] magistrate with a substantial basis for concluding that probable cause existed" to issue an arrest warrant, *Liston*, 120 F.3d at 973 (quoting *United States v. Stanert*, 762 F.2d 775, 782, as amended, 769 F.2d 1410 (9th Cir. 1985)). No reasonable magistrate would issue an arrest warrant based solely on such an unreliable identification. *Cf. Grant*, 315 F.3d at 1087–88.

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 22

1    Having established materiality, the Court turns to the second prong of the

2  judicial deception analysis.

3    ### 3.2.2    Navarrete has made a "substantial showing" that the
4         misrepresentations or omissions were made either
         intentionally or with reckless disregard for the truth.

5    The second judicial deception prong considers whether the material

6  misrepresentations or omissions were made "intentionally or with a reckless

7  disregard for the truth." *Bravo*, 665 F.3d at 1083. While the plaintiff must make a

8  substantial showing on this prong to survive summary judgment, they need not

9  provide "clear proof" of recklessness or intent. *Id.* at 1087. As the Ninth Circuit has

10  repeatedly held, "the question of intent or recklessness is 'a factual determination

11  for the trier of fact.'" *Id.* (quoting *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995)).

12    Here, a reasonable juror could find that Officer Sherwood either intentionally

13  or recklessly omitted key information from his affidavit. From the evidence, a jury

14  could find that the direct contradiction between V.C.'s recorded statement ("I don't

15  recognize him") and Officer Sherwood's written characterization (she "told me the

16  other guy in the dark clothing looked like Christian") constitutes intentional

17  misrepresentation rather than interpretive error. A jury could also infer from

18  Officer Sherwood's pattern of omissions—excluding Navarrete's documented height

19  while including witness estimates, omitting V.C.'s age and expressions of

20  uncertainty while emphasizing her eventual certainty—that he deliberately

21  selected facts to favor probable cause. And a jury could find that Officer Sherwood's

22  conduct by proceeding with Navarrete's arrest even after personally observing that

23

1
2
3

Navarrete matched Cano's height and complexion, and by repeating the same mischaracterizations, demonstrates either deliberate deception or reckless disregard for accuracy.

4
5
6
7
8

Given the importance of the omitted information, a reasonable juror could conclude that these omissions and misrepresentations were reckless or intentional. *See Liston*, 120 F.3d at 975 ("Whether that decision [to omit information from search warrant affidavit] was reckless or intentional is an issue of fact for the jury to decide.").

9

### 3.3    Due Process Claim Analysis.

10
11
12
13
14
15
16
17
18
19
20

In addition to his Fourth Amendment Claim, Navarrete alleges that Officer Sherwood deliberately fabricated evidence against him, violating his Fourteenth Amendment due process rights. "To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Unlike a Fourth Amendment claim, deliberate fabrication violates due process regardless of whether probable cause existed. *Id.* at 801–02 (holding lack of probable cause to prosecute defendant was not element of claim under § 1983 alleging deliberate fabrication of evidence by police officer in violation of due process clause of Fourteenth Amendment).

21
22
23

The plaintiff may prove deliberate fabrication through direct or circumstantial evidence. *Id.* at 801. Direct evidence exists when "an interviewer . . .

deliberately mischaracterize[d] witness statements in her investigative report." *Id.* at 799. (quoting *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)). When there is direct evidence of deliberate fabrication, the plaintiff need not show that the investigating officer knew of his innocence. *Id.* at 793. Circumstantial evidence exists when the evidence shows that an investigating officer knew or should have known that the suspect was innocent but continued to investigate them anyway. *Id.* at 799. From this, a reasonable juror could infer "that the investigator has an unlawful motivation to frame an innocent person." *Id.* "Similarly, if an investigator knowingly uses coercive and abusive techniques that likely will generate false information, then that circumstantial evidence suggests that the investigator is deliberately fabricating evidence." *Id.*

Here, Navarrete has presented both types of evidence. As discussed above, direct evidence supports a reasonable inference that Officer Sherwood deliberately mischaracterized V.C.'s statements during her first interview. *See e.g.*, Dkt. No. 109-1 at 47–48 (Sherwood dep.); *id.* at 218–24 (V.C. interview transcript). It also supports a finding that Officer Sherwood misled the issuing judge by omitting information that undermined the only identification of Navarrete.

Moreover, Officer Sherwood's certification for probable cause contains a potentially fabricated statement that was conspicuously not recorded. In his certification for determination of probable cause, Officer Sherwood testified that Navarrete answered questions about the gun while the police searched his home, suggesting that he knew about the gun and had once possessed it. Navarrete argues that Officer Sherwood fabricated his statements. This disputed fact is especially

1
2

important considering the officers found none of the evidence they expected to find during the search of Navarrete's home.

3
4
5
6
7
8
9

Circumstantial evidence of deliberate fabrication exists here, as a reasonable juror could find that Officer Sherwood continued to investigate Navarrete while knowing he was innocent when he observed that Navarrete matched the physical characteristics of the taller suspect, not the shorter, darker suspect he was alleged to be. But Officer Sherwood proceeded with the arrest and prosecution nonetheless. This persistence despite exculpatory evidence supports an inference of deliberate fabrication. *Spencer*, 857 F.3d at 799.

10
11
12
13
14

The allegedly fabricated evidence caused Navarrete's 141-day pretrial detention. The prosecutor's charging decision relied on Officer Sherwood's affidavit and certification, and charges were dismissed only after defense counsel identified the actual perpetrator who used the moniker "Wiked"—the name Cano had given from the beginning.

15
16
17
18

Whether Officer Sherwood deliberately fabricated evidence through mischaracterizing witness statements, inventing incriminating admissions, or continuing prosecution despite knowledge of innocence presents disputed issues of material fact that preclude summary judgment.

19
20

### 3.4    Officer Sherwood is not entitled to qualified immunity.

Officer Sherwood argues that he is entitled to qualified immunity on summary judgment, but the Court finds that he is not entitled to this protection.

21
22
23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

"Police officers are not entitled to qualified immunity if (1) the facts '[t]aken in the light most favorable to the party asserting the injury' show that 'the [officers'] conduct violated a constitutional right' and (2) 'the right was clearly established' at the time of the alleged violation." *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). While "[t]hese inquiries are questions of law," genuine issues of material fact may prevent the court from deciding them. *Id.* (citing *Morales v. Fry*, 837 F.3d 817, 819 (9th Cir. 2017)). When that happens, "the case must proceed to trial." *Id.*

For Navarrete's Fourth Amendment claim, it has long been clearly established that searching and arresting individuals without probable cause violates the Fourth Amendment. *Chism v. Wash. State*, 661 F.3d 380, 393 (9th Cir. 2011). And the Ninth Circuit has repeatedly held that "governmental employees are not entitled to qualified immunity on judicial deception claims" that survive summary judgment. *Id.*; *see Hervey*, 65 F.3d at 788. Because Navarrete's judicial deception claim survives summary judgment for the reasons discussed above, Officer Sherwood cannot invoke qualified immunity. *See Chism*, 661 F.3d at 393.

Nor does qualified immunity entitle him to summary judgment on Navarrete's Due Process claim. It was clearly established at the time of Navarrete's arrest that "[t]he Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official." *Spencer*, 857 F.3d at 793 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc)). It is also "clearly established that police officers [are] bound to disclose material, exculpatory evidence." *Mellen v. Winn*, 900 F.3d 1085, 1103 (9th Cir. 2018) (quoting *Carillo v. Cnty. of L.A.*, 798 F.3d

1210, 1219 (9th Cir. 2015)). As explained above, when taken in the light most favorable to Navarrete, there are questions of material fact about whether Officer Sherwood violated Navarrete's clearly established Due Process rights.

Accordingly, summary judgment on qualified immunity grounds is denied as to both claims.

### 3.5    Because Navarrete has failed to establish a pattern of similar constitutional violations, his *Monell* claim fails.

Navarrete seeks to hold the City of Kent liable under Section 1983 for allegedly inadequate police training. While concerning evidence exists about individual officers' training deficiencies, the Supreme Court requires far more to establish municipal liability than what Navarrete has presented.

Under the *Monell* doctrine, "[m]unicipalities are 'persons' under 42 U.S.C. § 1983 and thus may be liable for causing a constitutional deprivation." *Long*, 442 F.3d at 1185 (*citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). This theory of liability is only viable, however, when the execution of a government policy or custom inflicts the plaintiff's injury. *Id*. In other words, "[a] municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents." *Id*.

A municipality's failure to train employees may serve as the basis for Section 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This deliberate indifference standard is "stringent," requiring proof that a municipal actor "'disregarded a known or obvious

1    consequence of his action.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting

2    *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)). Most

3    critically for this case, the Supreme Court has held that "[a] pattern of similar

4    constitutional violations by untrained employees is 'ordinarily necessary' to

5    demonstrate deliberate indifference for purposes of failure to train." *Id*. at 62

6    (quoting *Bryan Cnty.*, 520 U.S. at 409). The Court's reasoning is straightforward:

7    "Without notice that a course of training is deficient in a particular respect,

8    decisionmakers can hardly be said to have deliberately chosen a training program

9    that will cause violations of constitutional rights." *Id*.

10          Navarrete's attempt to rely on the Kammerzell matter as evidence of a

11   pattern, Dkt. No. 108 at 15–17, fails to create a genuine dispute of material fact.

12   That incident involved fundamentally different misconduct—workplace

13   discrimination and instructing subordinates to lie about internal Nazi imagery—not

14   judicial deception in criminal proceedings. As the Supreme Court emphasized in

15   *Connick*, prior violations must be "similar to the violation at issue" to provide the

16   requisite notice. 563 U.S. at 62–63. The Court explained that four prior *Brady*

17   reversals "could not have put Connick on notice that the office's Brady training was

18   inadequate with respect to the sort of Brady violation at issue" because "[n]one of

19   those cases involved failure to disclose blood evidence, a crime lab report, or

20   physical evidence of any kind." *Id*. The Kammerzell incident, involving workplace

21   misconduct rather than warrant-related deception, similarly could not have put

22   Kent on notice of the need for different training regarding judicial proceedings. No

23   reasonable jury could find the pattern requirement satisfied based on this evidence.

Navarrete cannot escape the pattern requirement by invoking the narrow single-incident exception recognized in *Canton*. While *Canton* acknowledged that "in a narrow range of circumstances" a pattern might not be necessary, *see Connick*, 563 U.S. at 63, the Supreme Court provided only one example: the obvious need for training officers on constitutional limits for deadly force, *id*. The *Connick* Court explained that this exception applies where "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," *id*. at 101 (Ginsberg, J., dissenting), and understand the "known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," *id*. at 63–64. The Ninth Circuit has interpreted this exception narrowly, limiting it to times when employees are "making life-threatening decisions[.]" *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1155 (9th Cir. 2021) ("Where, as here, the County employees are not making life-threatening decisions, and because micromanaging of municipal policies should be avoided, the single incident exception is inapplicable.") (citation modified). The isolated incident of one officer allegedly engaged in judicial deception in a warrant application does not meet the single-incident exception.

Navarrete's reliance on *Long v. City of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006), to excuse his failure to demonstrate a pattern of violations is misplaced. (Dkt. 108 at 30). *Connick* was decided after *Long*, and post-*Connick* cases consistently require pattern evidence. *See, e.g.*, *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) ("Neither Baca nor the County was faced with a pattern of similar constitutional violations by untrained employees.").

1    Even viewing the evidence favorably to Navarrete, as the Court must, the

2  officers' individual training deficiencies—Crane's inability to define "probable

3  cause" after fifteen years, Dkt. No. 109-1 at 116–17, and Sherwood's lack of recall

4  about constitutional training, Dkt. 109-1 at 4–7, 10—constitute negligence at most,

5  not deliberate indifference. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484–85

6  (9th Cir. 2007) ("evidence of the [city's] failure to train a single officer is insufficient

7  to establish a municipality's deliberate policy" for *Monell* liability). Kent maintained

8  written policies on these issues, Dkt. No. 70 ¶¶ 4–13, and without prior violations

9  providing notice of constitutional deficiencies, no reasonable jury could find

10  deliberate indifference. Similarly, Officer Sherwood's promotion after Navarrete's

11  tort claim, Dkt. 108 at 30, fails to establish ratification absent evidence that

12  policymakers knew of and approved the specific alleged misconduct. *Christie v.*

13  *Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) ("[T]o show ratification, a plaintiff must

14  prove that the "authorized policymakers approve a subordinate's decision and the

15  basis for it.") (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

16    Because Navarrete has failed to present evidence from which a reasonable

17  jury could find that Kent acted with deliberate indifference to a known or obvious

18  risk, no genuine dispute of material fact exists, and Defendants are entitled to

19  judgment as a matter of law. Accordingly, Defendants' motion for summary

20  judgment on the *Monell* claim is GRANTED.

21

22

23

1

2

### 3.6    Issues of material fact preclude summary judgment on Navarrete's false arrest claim.

Along with his federal claims, Navarrete brings state-law claims for false arrest and malicious prosecution arising from the same investigative conduct.

Under Washington law, "[t]he gist of an action for false arrest . . . is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority." *Bender v. City of Seattle*, 664 P.2d 492, 499 (Wash. 1983) (en banc). "[T]he general rule is that an officer is not liable if he makes an arrest under a warrant." *Id*. But that is not the case "when the same officer provides information to obtain the warrant and then also executes the warrant." *Id*. In that circumstance, the officer "is not merely directed to fulfill the order of the court; he is in a position to control the flow of information to the magistrate upon which probable cause determinations are made." *Id*. Thus, Washington courts "see no distinction between an officer who makes an invalid, warrantless arrest and one who knowingly withholds facts in order to obtain a warrant." *Id*. Nor do they allow officers to "'cleanse' the transaction by supplying only those facts favorable to the issuance of a warrant." *Id*. at 500.

As established above, Officer Sherwood both supplied the information for the warrant and executed it. Because genuine disputes of material fact exist regarding whether Officer Sherwood knowingly withheld and misrepresented facts to obtain the warrant he then executed, summary judgment on the false arrest claim is DENIED.

### 3.7   Issues of material fact preclude summary judgment on Navarrete's malicious prosecution claim.

Navarrete's other state-law claim alleges malicious prosecution based on the same course of conduct underlying his federal and false arrest claims.

To maintain an action for malicious prosecution, the plaintiff must prove five elements: "(1) the prosecution was instituted or continued by the defendant, (2) there was want of probable cause for the institution or continuation of the proceeding, (3) the proceeding was instituted or continued through malice, (4) the proceeding was terminated on the merits in favor of the plaintiff or was abandoned, and (5) plaintiff suffered injury as a result of the prosecution." *Youker v. Douglas Cnty.*, 258 P.3d 60, 66–67 (Wash. Ct. App. 2011) (citing *Bender*, 664 P.2d at 500). Defendants argue that summary judgment is appropriate because probable cause existed for Navarrete's arrest and because Navarrete has failed to provide evidence of malice.

Probable cause has not been established as a matter of law, making summary judgment on the second element inappropriate. "Washington cases have long held that probable cause is deemed established as a matter of law . . . if it clearly appears that the defendant provided the prosecuting attorney with a full and fair disclosure, in good faith, of all the material facts known to him or her, and the prosecutor thereupon preferred a criminal charge and caused arrest." *Id.* at 67. Because issues of material fact exist on Navarrete's judicial deception claim, probable cause is not established as a matter of law.

Turning to the malice requirement, Washington law provides that "[m]alice may be inferred from lack of probable cause and from proof that the investigation or prosecution was undertaken with improper motives or reckless disregard for the plaintiff's rights." *Id.* at 68 (citing *Turngren v. King Cnty.*, 705 P.2d 258, 266 (Wash. 1985)). Navarrete has submitted evidence from which the jury may infer that his investigation or prosecution were undertaken with improper motives or a reckless disregard for his rights. This evidence includes but is not limited to evidence of judicial deception and deliberate fabrication, as well as the purported spoliation of evidence after Navarrete's arrest.

Because disputed facts exist regarding probable cause, malice, and whether Officer Sherwood made a full and fair disclosure to prosecutors, summary judgment on the malicious prosecution claim is DENIED.

## 4. CONCLUSION

Accordingly, Defendants' motion for summary judgment is DENIED as to all claims against Officer Sherwood and GRANTED as to the *Monell* claim against the City of Kent. Dkt. No. 83.

The City of Kent is DISMISSED from this action. This case shall proceed to trial on all remaining claims against Officer Sherwood.

Dated this 8th day of October, 2025.

Jamal N. Whitehead
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT- 34